UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

ANGELA CLEVELAND                    CIVIL ACTION NO. 21-4338

VERSUS                              JUDGE EDWARDS

BIENVILLE MEDICAL CENTER INC ET    MAG. JUDGE HORNSBY
AL

**MEMORANDUM RULING**

Before the Court is a Motion for Summary Judgment filed by Defendant Bienville Medical Center Inc. ("BMC" or "Defendant"), seeking dismissal of Plaintiff Brianna Babers' ("Ms. Babers" or "Plaintiff") claims.[1] Ms. Babers filed a response opposing the Motion,[2] and BMC replied.[3]

## I.    BACKGROUND

This case arises from events that took place on or about December 18, 2020, shortly after 2:00 a.m., when Angela Cleveland ("Ms. Cleveland") brought her twenty-nine-year-old son, Kedeldric Dontrez Brown ("Mr. Brown"), to the Emergency Department ("ED") entrance of BMC.[4] Their arrival and subsequent interactions with BMC staff, including Renee Samuels, RN, and ED clerk Nicole Stanley ("ED staff"), were recorded by BMC's security cameras, and that footage has been referenced and reviewed in various depositions in this case.[5]

---

[1] R. Doc. 80.
[2] R. Doc. 97.
[3] R. Doc. 99.
[4] R. Doc. 48 at 2–5.
[5] R. Doc. 80-3, manual attachment Exhibits A–E.

### a. Procedural Background

On December 17, 2021, Ms. Cleveland filed a complaint on her own behalf and on behalf of Mr. Brown's estate against BMC, Renee Samuels ("Nurse Samuels"), and "Jane Doe" (now identified as Nicole Stanley).[6] The complaint alleged that Defendants were liable under three counts: (1) violation of the Emergency Medical Treatment and Labor Act ("EMTALA"), 42 U.S.C. § 1395(dd); (2) violation of Louisiana's "Anti-Dumping Statute," La. R.S. 40:2113.4; and (3) medical malpractice under Louisiana law.[7] Specifically, Ms. Cleveland alleged that Defendants failed or refused to provide Mr. Brown with a medical screening or treatment to determine whether he had an emergency medical condition, which resulted in his death.[8]

On August 2, 2022, Nurse Samuels, an agency nurse not employed by BMC, filed a Motion to Dismiss for Lack of Standing.[9] The motion asserted that Mr. Brown had a daughter ("K.D.").[10] Therefore, Ms. Cleveland did not have the requisite standing under Louisiana's wrongful death and survival laws.[11] On September 23, 2022, Ms. Cleveland filed a Motion for Leave to File an Amended Complaint to substitute Brianna Babers as plaintiff on behalf of Ms. Babers' and Mr. Brown's minor child, K.D. and the estate of Mr. Brown.[12] On December 12, 2022, the

---

[6] R. Doc. 1.
[7] *Id.*
[8] *Id.*
[9] R. Doc. 21.
[10] *Id.* at 2.
[11] *Id.*
[12] R. Doc. 41.

Magistrate Judge granted the motion for leave[13] but reserved judgment on the issue of timeliness of the claims.[14]

### b. Factual Background

Mr. Brown had a history of treatment at BMC's ED prior to the events of December 18, 2020. On April 3, 2019, Mr. Brown visited BMC complaining of abdominal pain and vomiting blood.[15] He informed the attending physician, Dr. Susan Wingo, and RN Jim Owens that he was taking Seroquel, a medication commonly prescribed for schizophrenia, bipolar disorder, and related mood conditions.[16] On December 15, 2020, Mr. Brown returned to BMC, reporting nausea, abdominal pain, vomiting, fever, chills, and anxiety.[17] He also disclosed to RN Jennifer Davis and the attending physician, Dr. Kevin Chiasson, that he had been diagnosed with Post-Traumatic Stress Disorder ("PTSD") and was taking Klonopin, a medication used to treat panic attacks.[18]

At approximately 2:00 a.m. on the morning of December 18, 2020, Ms. Cleveland brought Mr. Brown to BMC's ED, believing that he was experiencing a psychiatric episode, possibly a panic attack.[19] When Ms. Cleveland and Mr. Brown arrived at BMC, Mr. Brown exited the vehicle alone.[20] The ED staff asked if they

---

[13] After the First Amended Complaint was filed, Nurse Samuels filed a Motion for Summary Judgment on the basis that the state law claims against her were prescribed and did not relate back under Louisiana law. (R. Doc. 52). On February 15, 2023, Plaintiff filed a Consent Motion to Voluntarily Dismiss Defendant Samuels (R. Doc. 60), which this Court granted on April 5, 2023, rendering the summary judgment motion moot. (R. Doc. 61).
[14] R. Doc. 47.
[15] R. Doc. 48 at ¶ 10.
[16] *Id.*
[17] *Id.* at ¶ 11.
[18] *Id.* at ¶¶ 11–12.
[19] *Id.* at ¶ 13.
[20] R. Doc. 80-1 at 5.

could assist him, and Mr. Brown responded that he wanted the results of a recent COVID-19 test.[21] The ED staff informed Mr. Brown that they could not provide him with the test results and gave him a phone number to call later that morning.[22] They also asked if he needed to be seen by the ED.[23]

Mr. Brown walked back to the car where Ms. Cleveland remained in the driver's seat and conversed with her while he stood outside the car.[24] After speaking briefly with his mother, Mr. Brown returned to the ED entrance.[25] The ED staff again asked if he was seeking emergency care and whether he was experiencing any symptoms, and Mr. Brown informed them that he was not and reiterated that he was there only to obtain the results of his COVID-19 test.[26] The ED staff again informed him that he would need to call for his COVID-19 results.[27]

At this point, Ms. Cleveland addressed the ED staff from her car, stating that she did not bring her son to the hospital for COVID-19 results.[28] ED staff responded that Mr. Brown had given them different information and that because Mr. Brown was above the age of majority, they had to rely on the information provided by him.[29] Ms. Cleveland then told the ED staff, "[i]t is on y'all if he kills someone tonight," before driving away and leaving Mr. Brown at BMC.[30]

---

[21] *Id.*
[22] *Id.*
[23] *Id.*
[24] *Id.*
[25] *Id.*
[26] *Id.*
[27] *Id.*
[28] *Id,*
[29] *Id.*; R. Doc. 97 at 7.
[30] *Id.*

Following Ms. Cleveland's departure, Nurse Samuels again asked Mr. Brown why he needed to be seen, and Mr. Brown stated that his mother said he was "coughing too hard."[31] Nicole Stanley, another ED staff member, then walked outside calling Mr. Brown's name, but Mr. Brown had already left the premises.[32] Finally, Mr. Brown walked to and entered Interstate 20 on foot about two hours after leaving BMC's ED where he was struck and killed by oncoming traffic.[33]

## II.    LEGAL STANDARD

Summary judgment is appropriate when the evidence shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[34] "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[35] "A dispute is genuine if the summary judgment evidence is such that a reasonable jury could return a verdict for the [non-movant]."[36] In evaluating a motion for summary judgment, the court "may not make credibility determinations or weigh the evidence" and "must resolve all ambiguities and draw all permissible inferences in favor of the non-moving party."[37]

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those

---

[31] R. Doc. 80-1 at 6.
[32] *Id.*
[33] *Id.*; R. Doc. 48 at ¶¶ 22-23.
[34] Fed. R. Civ. P. 56(a).
[35] *Hyatt v. Thomas*, 843 F.3d 172, 177 (5th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).
[36] *Id.* (internal quotations omitted).
[37] *Total E&P USA Inc. v. Kerr-McGee Oil & Gas Corp.*, 719 F.3d 424, 434 (5th Cir. 2013) (internal citations omitted).

portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."[38] "The moving party may meet its burden to demonstrate the absence of a genuine issue of material fact by pointing out that the record contains no support for the non-moving party's claim."[39] Thereafter, if the non-movant is unable to identify anything in the record to support its claim, summary judgment is appropriate.[40]

### III.    LAW & ANALYSIS

In its Motion, BMC argues that Ms. Babers' claims under EMTALA, La. R.S. 40:2113.4, and Louisiana medical malpractice law should be dismissed. Specifically, Defendant asserts (1) that Plaintiff's EMTALA claim is unsupported by the evidence and that BMC satisfied its statutory obligations to provide an appropriate medical screening examination; (2) that Plaintiff's La. R.S. 40:2113.4 claim fails because her state law claims are prescribed, the statute provides no right of action, and the facts and evidence do not demonstrate a plausible claim; and (3) Mr. Brown was not a "patient" under the Louisiana Medical Malpractice Act, and that Plaintiff's claims for medical malpractice have prescribed under Louisiana law.[41] The Court will address each of these arguments in turn.

#### a.  EMTALA Claims

---

[38] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting *Anderson*, 477 U.S. at 247).
[39] *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002).
[40] *Id.*
[41] R. Doc. 80.

Plaintiff Babers alleges that BMC violated EMTALA by "failing and refusing to provide Mr. Brown with any medical screening or medical treatment to determine whether Mr. Brown had an emergency medical condition which needed to be treated immediately and by failing to provide necessary stabilizing treatment."[42] Ms. Babers argues that BMC failed to provide Mr. Brown with an "appropriate medical screening examination" required under EMTALA because Ms. Cleveland's statements to the ED staff constituted a request for examination on Mr. Brown's behalf, thereby triggering EMTALA's screening obligation under 42 U.S.C. § 1395dd(a).[43] Plaintiff's expert, Dr. Karen Jubanyik, contends that Ms. Cleveland's late-night appearance at the ED and her requests that BMC evaluate her son were sufficient to place BMC on notice of a potential psychiatric emergency.[44] Plaintiff argues that even if Mr. Brown himself did not explicitly request care, EMTALA applies when a third party makes a request or when observable circumstances suggest the need for emergency care.[45] Plaintiff further asserts that BMC's reliance on Mr. Brown's calm demeanor and his denial of symptoms was unreasonable in the context of a psychiatric emergency.[46] Dr. Jubanyik testified that a reasonable screening would have included reviewing Mr. Brown's medical history, consulting with his mother for collateral information, and conducting a psychiatric evaluation.[47] Dr. Jubanyik testified that psychiatric patients often minimize their symptoms or lack insight into their condition.[48]

---

[42] R. Doc. 48 at 5.
[43] R. Doc. 97 at 12.
[44] R. Doc. 97 at 16.
[45] R. Doc. 97 at 13.
[46] R. Doc. 97 at 13–14.
[47] R. Doc. 97 at 16.
[48] R. Doc. 97 at 16.

Conversely, Defendant BMC argues that Plaintiff's EMTALA claims are unsupported by the evidence. BMC argues that EMTALA only imposes a duty to screen when a request for treatment is made by the patient or on the patient's behalf.[49] BMC maintains that no such request was made here — Mr. Brown never requested medical care beyond his COVID-19 test results, and Ms. Cleveland's vague statements from the car did not rise to the level of a formal request for treatment under EMTALA.[50] BMC argues that it did not refuse care to Mr. Brown, and Mr. Brown was calm, cooperative, and in no apparent distress.[51] He explicitly told staff that he was there for COVID-19 test results and that his mother thought he was "coughing too much."[52]

EMTALA was enacted "to prevent 'patient dumping,' which is the practice of refusing to treat patients who are unable to pay."[53] "The act requires that participating hospitals give the following care to an individual who is presented for emergency medical care: (1) an appropriate medical screening; (2) stabilization of a known emergency medical condition; and (3) restrictions on transfer of an unstabilized individual to another medical facility."[54] The act provides patients with a private cause of action for any personal harm a patient suffers as a direct result of the hospital's EMTALA violation.[55]

---

[49] R. Doc. 80-1 at 8.

[50] R. Doc. 80-1 at 8–9.

[51] R. Doc. 80-1 at 8–9.

[52] R. Doc. 80-1 at 9.

[53] *Battle v. Mem'l Hosp. at Gulfport,* 228 F.3d 544, 557 (5th Cir. 2000) (quoting *Marshall v. E. Carroll Parish Hosp. Serv. Dist.,* 134 F.3d 319, 322 (5th Cir. 1998) (internal quotation marks omitted)).

[54] *Id.* (citing 42 U.S.C. § 1395dd(a)–(c)).

[55] 42 U.S.C. § 1395dd(d)(2)(A).

EMTALA's medical screening requirement provides in relevant part:

> In the case of a hospital that has a hospital emergency department, if any individual ... comes to the emergency department and *a request is made on the individual's behalf* for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition ... exists.[56]

The statute further prescribes a hospital's behavior in the event a patient refuses treatment:

> A hospital is deemed to meet the requirement of paragraph (1)(A) with respect to an individual if the hospital *offers the individual the further medical examination* and treatment described in that paragraph and informs the individual (or a person acting on the individual's behalf) of the risks and benefits to the individual of such examination and treatment, but the individual (or a person acting on the individual's behalf) *refuses to consent to the examination and treatment*. The hospital shall take all reasonable steps to secure the individual's (or person's) written informed consent to refuse such examination and treatment.[57]

The case *sub judice* concerns EMTALA's screening requirement. EMTALA's language under 42 U.S.C. § 1395dd(a) provides that the hospital's screening obligation arises when "a request is made on the individual's behalf for examination or treatment for a medical condition." EMTALA does not define what is an "appropriate screening examination," but the Fifth Circuit has held that it is "a screening examination that the hospital would have offered to any other patient in a similar condition with similar symptoms."[58]

---

[56] 42 U.S.C. § 1395dd(a) (emphasis added).
[57] 42 U.S.C. § 1395dd(b)(2) (emphasis added).
[58] *Marshall,* 134 F.3d at 323.

While Mr. Brown himself denied symptoms and declined care, Ms. Cleveland's statements from the car could create a factual dispute over whether a valid request for screening was made on his behalf. Ms. Cleveland brought Mr. Brown to the ED in the early morning hours, which could reasonably suggest that she believed he required medical attention. Her statement implying that her son posed a danger to himself or others ("if he killed someone, it would be on [BMC]") could be interpreted as an indication of a potential psychiatric emergency. These facts create a genuine issue of material fact over whether BMC's screening obligation under EMTALA was triggered and whether BMC fulfilled such an obligation.

A reasonable jury could conclude that BMC had sufficient information to warrant a screening, particularly in light of the statement made by Ms. Cleveland about Mr. Brown's mental state. The conflict between Mr. Brown's denial of symptoms and his mother's statements about his mental state creates a genuine issue of material fact. Moreover, even if Mr. Brown's own statements were sufficient to decline care, EMTALA requires that a hospital "take all reasonable steps to secure the individual's (or person's) written informed consent to refuse such examination and treatment." While Nicole Stanley called after Mr. Brown, there is no evidence that BMC attempted to obtain written informed consent from him, raising another factual dispute as to whether BMC satisfied its EMTALA obligations.

These factual disputes preclude summary judgment on this claim; therefore, BMC's motion for summary judgment on Plaintiff's EMTALA claim is **DENIED**.

### b.  State Law Claims Under La. R.S. 40:2113.4

La. R.S. 40:2113.4 is Louisiana's "Anti-Dumping" statute, modeled after the federal EMTALA. It requires certain hospitals to provide emergency medical services to all individuals, regardless of their insurance status or ability to pay.[59] It is the second of three counts Plaintiff Babers brings against BMC.[60] Defendant BMC asserts that the La. R.S. 40:2113.4 claim (1) has prescribed, (2) is otherwise incognizable as the statute does not create a private right of action, and (3) requires Ms. Babers to prove BMC denied emergency services to Mr. Brown based on insurance status or ability to pay, which she did not. The Court will take each argument in turn.

### i.  Prescription

Plaintiff alleges that Defendant BMC violated state law La. R.S. 40:2113.4 by "failing and refusing to provide Kedeldric Dontrez Brown with any medical screening or medical treatment to determine whether Kedeldric Dontrez Brown had an emergency medical condition which needed to be treated, whether he posed a danger to himself or others, and by failing to provide necessary stabilizing treatment[.]"[61] Under La. Civ. Code art. 3492, delictual actions prescribe one year from the date the injury or damage is sustained.[62] The original plaintiff, Angela Cleveland, filed her complaint on December 17, 2021, within the one-year period.[63] However, the current Plaintiff, Ms. Babers, filed her complaint on December 12, 2022 — outside the one-

---

[59] La. R.S. 40:2113.4.
[60] R. Doc. 48 at 5.
[61] R. Doc. 48 at 6.
[62] La. Civ. Code art. 3492.
[63] R. Doc. 1.

year prescriptive period.[64] BMC argues that Ms. Babers' claims can only survive if they relate back to the original complaint under Federal Rule of Civil Procedure 15(c).[65] BMC argues that the relation-back doctrine does not apply because Ms. Cleveland lacked a right of action when she filed the original complaint.[66]

Louisiana's wrongful death and survival statutes (La. Civ. Code arts. 2315.1 and 2315.2) establish a hierarchy of beneficiaries who may bring claims after a decedent's death.[67]

Louisiana Civil Code Article 2315.1 (A) and (B) provides:

A. If a person who has been injured by an offense or quasi offense dies, the right to recover all damages for injury to that person, his property or otherwise, caused by the offense or quasi offense, shall survive for a period of one year from the death of the deceased in favor of:

    1) The surviving spouse and child or children of the deceased, or either the spouse or the child or children.

    2) The surviving father and mother of the deceased, or either of them if he left no spouse or child surviving.

    3) The surviving brothers and sisters of the deceased, or any of them, if he left no spouse, child, or parent surviving.

    4) The surviving grandfathers and grandmothers of the deceased, or any of them, if he left no spouse, child, parent, or sibling surviving.

B. In addition, the right to recover all damages for injury to the deceased, his property or otherwise, caused by the offense or quasi offense, may be urged by the deceased's succession representative in the absence of any class of beneficiary set out in Paragraph A.

---

[64] R. Doc. 48.
[65] R. Doc. 80-1 at 13.
[66] R. Doc. 80-1 at 14.
[67] La. Civ. Code arts. 2315.1 and 2315.2.

Louisiana Civil Code Article 2315.2 (A) and (B) provides:

A. If a person dies due to the fault of another, suit may be brought by the following persons to recover damages which they sustained as a result of the death:

   1) The surviving spouse and child or children of the deceased, or either the spouse or the child or children.

   2) The surviving father and mother of the deceased, or either of them if he left no spouse or child surviving.

   3) The surviving brothers and sisters of the deceased, or any of them, if he left no spouse, child, or parent surviving.

   4) The surviving grandfathers and grandmothers of the deceased, or any of them, if he left no spouse, child, parent, or sibling surviving.

B. The right of action granted by this Article prescribes one year from the death of the deceased.

Both survival actions and wrongful death actions prescribe one year from the death of the deceased, and the existence of a higher class of survivors prevents a person in a lower class from filing suit.[68]

In the instant case, a proper plaintiff had one year from December 18, 2020, the date of Mr. Brown's death, to file a wrongful death and survival action because the claims would prescribe on December 18, 2021. Mr. Brown's minor child, K.D., held the primary right to bring a wrongful death or survival claim.[69] Ms. Cleveland was not the proper plaintiff under the wrongful death and survival action statutes; therefore, BMC argues, her complaint was invalid.[70] Because Ms. Cleveland's

---

[68] *Abraugh v. Altimus*, 26 F.4th 298, 302 (5th Cir. 2022).

[69] Surviving children are the first class of those who are eligible to bring a wrongful death and/or survival action claim. Their existence precludes other, lower classes from bringing those claims.

[70] R. Doc. 80-1 at 15.

complaint was not valid, Defendants contend that Ms. Babers' amended complaint cannot relate back to it.[71] The proper party was not made plaintiff until December 12, 2022, close to two years after Mr. Brown's death. Some Louisiana case law has held that an amended petition cannot relate back to the original petition when the original petition was not legally viable because the party bringing it lacked a right of action.[72] However, Fifth Circuit precedent compels this Court to rule differently.

In in the case of *Nobre on behalf of K.M.C. v. Louisiana Dep't of Pub. Safety*, the Fifth Circuit allowed relation back of a facially prescribed complaint after a plaintiff who believed she was a proper party to bring a wrongful death and survival action discovered her deceased son had surviving children who were the proper parties to bring such claims.[73] *Nobre* applied Louisiana's relation-back doctrine in a similar setting, and that approach is binding on the Court.

In *Nobre*, Kenneth Cotton, a Louisiana inmate, was attacked by another inmate using a combination lock while Cotton was sleeping at the David Wade Correctional Center.[74] Cotton suffered severe head injuries, underwent brain surgery, and died from his injuries on February 20, 2016.[75] Cotton's mother, Enriqueta Moore, filed a wrongful death and survival action on September 14, 2016, within Louisiana's one-year prescriptive period, alleging that the prison officials failed to protect Cotton and provide adequate medical care, thereby violating his

---

[71] *Id.*

[72] *Watson v. Woldenberg Vill., Inc.*, 323 So. 3d 951, 954-55 (La. Ct. App. 4th Cir. 2021); also see *Naghi v. Brener*, 17 So.3d 919, 925 (La. 2009) ("Further, the relation back theory assumes that there is a legally viable claim to which the pleading can relate back").

[73] *Nobre on behalf of K.M.C. v. Louisiana Dep't of Pub. Safety*, 935 F.3d 437 (5th Cir. 2019).

[74] *Id.*

[75] *Id.*

Eighth Amendment rights under 42 U.S.C. § 1983.[76] Moore believed she was the proper party to bring the action.[77]

In March 2017, Moore learned that Cotton had two minor children, making them the proper parties under Louisiana law to bring the claims.[78] Moore amended the complaint to substitute the children's natural tutors as plaintiffs.[79] However, the amended complaint was filed 16 days after the one-year prescriptive period had expired.[80] The district court dismissed the case, holding that the amended complaint could not relate back because the defendants were not shown to have had notice of Cotton's children.[81]

The Fifth Circuit reversed.[82] It held that the amended complaint related back to the original complaint under Federal Rule of Civil Procedure 15(c) and Louisiana's relation-back doctrine as set forth in *Giroir v. South Louisiana Medical Center*.[83] The court found that the amended complaint satisfied the four *Giroir* factors: (1) the amended claims arose from the same occurrence—Cotton's death—alleged in the original complaint; (2) the defendants knew or should have known about Cotton's children because prison records (a Master Record Inquiry) documented that Cotton had two children; (3) the new plaintiffs (Cotton's children) were closely related to the original plaintiff (Cotton's mother), so the underlying claim was unchanged; and (4)

---

[76] *Id.*
[77] *Id.*
[78] *Id.*
[79] *Id.*
[80] *Id.*
[81] *Id.*
[82] *Id.*
[83] *Id.* (citing *Giroir v. S. Louisiana Med. Ctr., Div. of Hosps.*, 475 So. 2d 1040 (La. 1985)).

the defendants were not prejudiced by the 16-day delay in amending the complaint.[84] Because all four factors were satisfied, the Fifth Circuit held that the amended complaint properly related back under both Louisiana law and Rule 15(c).[85]

In the current case, Defendant BMC is arguing that their case should be treated differently from *Nobre* because the "knew or should have known" prong of the *Giroir* test is not satisfied in this instance.[86] Unlike in *Nobre*, where the prison had records indicating the deceased had children, BMC claims there is no evidence in the pleadings, discovery, or depositions to show that they had any knowledge—actual or constructive—of the existence of Mr. Brown's child before being informed through counsel for Nurse Samuels months after filing their Answer.[87] BMC argues further that unlike in *Nobre*, where the original plaintiff (the inmate's mother) did not know of the children's existence when she filed the suit, Ms. Cleveland was aware of the existence of Mr. Brown's child.[88] Since the Ms. Cleveland already knew of the child's existence, BMC asserts that there is no justification for relation back under *Giroir* because there was no later-discovered fact that necessitated a substitution of plaintiffs after prescription had run.[89]

In response, Plaintiff Babers contends that BMC was aware of Mr. Brown's minor child early in the case. Specifically, the defendants' initial disclosures on August 2, 2022, listed Brianna Babers, the mother of the minor child, as a person

---

[84] *Id.*
[85] *Id.*
[86] R. Doc. 80-1 at 17.
[87] *Id.*
[88] *Id.*
[89] *Id.*

with relevant knowledge.[90] Ultimately, Ms. Babers argues that *Nobre* supports that such knowledge is sufficient to permit relation back.[91]

The Fifth Circuit's holding in *Nobre* necessitates an application of the *Giroir* factors to the case. As to the first factor, the amended claim arises from the same conduct, transaction, or occurrence set forth in the original pleading, there is no question that it is satisfied as Plaintiff's amended complaint arises from the same alleged wrongful conduct—the death of Mr. Brown due to BMC's alleged failure to provide adequate medical care—described in the original complaint filed by Ms. Cleveland. This satisfies the first *Giroir* factor.

As to the second factor, whether the defendant either knew or should have known of the existence and involvement of the new plaintiff, under *Nobre*, knowledge of the minor child satisfies the "knew or should have known" requirement. Given the knowledge of the minor child through initial disclosures this factor is satisfied. The Court declines to delve into a guessing game as to what length of time is required to trigger a departure from the Fifth Circuit's ruling in *Nobre*. The Court notes that BMC knew about the minor child early in this case, before a scheduling order was entered or a trial date was set.

The third factor is likewise satisfied in favor of Plaintiff Babers. The relationship between Ms. Cleveland (the original plaintiff) and Ms. Babers (on behalf of the minor child) is sufficiently close. Both are direct representatives of Mr. Brown's immediate family. Under *Giroir* and *Nobre*, a familial relationship between the

---

[90] R. Doc. 97 at 22.
[91] *Id.*

original and substituted plaintiff is sufficient to satisfy this prong. Therefore, this factor is met.

Finally, the fourth factor, lack of prejudice to the defendant, is satisfied. Defendants have not identified any specific prejudice resulting from the substitution of plaintiffs. The claims remain unchanged in substance, and the factual allegations and legal issues remain identical to those raised in the original complaint. The discovery deadline passed over a year ago.[92] Thus, the substantive evidence regarding Ms. Babers' claims and BMC's defenses has already been gathered and exchanged to the extent required.[93]

The Court observes that while the facts in this case concerning the timing of filing and the parties' knowledge of the proper party differ to some extent from the facts in *Nobre*, those differences are not sufficient to warrant departure from the binding precedent of the Fifth Circuit. Accordingly, the state claims under R.S. 40:2113.4 are not barred by virtue of prescription.

### ii. No Private Cause of Action / Failure to Prove Denial of Emergency Services Based on Insurance Status or Ability to Pay

Turning to the next two issues regarding La. R.S. 40:2113.4, Defendant BMC argues that La. R.S. 40:2113.4 does not create an express private right of action, and without a private right of action, Plaintiff Babers cannot sustain a claim under the statute.[94] BMC further contends that even if a private right of action were assumed,

---

[92] R. Doc. 97 at 19-20.
[93] See *Kumasi v. Cochran*, 2015 WL 4429192, at *4 (M.D. La. July 17, 2015).
[94] R. Doc. 80-1 at 10.

Ms. Babers has not presented any evidence that Mr. Brown's insurance status or ability to pay was ever an issue during the incident.[95] Since the statute is designed to ensure equal access to emergency care, regardless of financial status, Defendant argues that the absence of evidence regarding Mr. Brown's financial situation is fatal to Plaintiff's claim.[96] Plaintiff fails to address Defendant's argument in her opposition, and her silence on this issue amounts to a concession that the claim is unsupported.[97]

> La. R.S. 40:2113.4(A) provides relevantly:

> Any general hospital … shall make its emergency services available to all persons residing in the territorial area of the hospital *regardless of whether the person is covered by private, federal Medicare or Medicaid, or other insurance.* … in no event shall emergency treatment be denied to anyone on account of *inability to pay*.[98]

The statute contains no express right to sue or prohibition against such a suit. The Court hesitates to declare that the lack of an express provision of a private right of action in a statute would preclude a finding that one may exist. The Louisiana Supreme Court in *Anderson v. Ochsner Health Sys.*, held "[c]ourts can find the existence of a private right of action where the statute does not contain limiting language expressly barring such action."[99] In *Anderson* the statute in question did not contain language expressly providing for or barring a private right of action,

---

[95] *Id.*

[96] *Id.*

[97] R. Doc. 97.

[98] La. R.S. 40:2113.4(A) (emphasis added).

[99] *Anderson v. Ochsner Health Sys.*, 172 So. 3d 579, 583 (La. 2014) (The court held that a patient-plaintiff had a private right of action under the Health Care and Consumer Billing and Disclosure Protection Act even though the Act did not contain an private right of action).

prompting the Court to examine legislative intent.[100] However, even if this Court were to conduct such an analysis, Defendant's second argument—that Plaintiff cannot meet her burden without evidence (or even allegations) that BMC acted on evidence of Mr. Brown's financial status—proves persuasive.

A review of the facts reveals that at no point during BMC's interactions with Mr. Brown was his ability to pay or insurance status discussed or implicated in any way. While the Court does not foreclose potential liability under EMTALA, there are no facts or evidence to suggest that Mr. Brown's lack of screening was connected to his ability to pay. Accordingly, the request in BMC's Motion to dismiss Plaintiff's claims under La. R.S. 40:2113.4 is **GRANTED**, and those claims are dismissed.

### c. Medical Malpractice Claims & Prescription

### i. Prescription

Plaintiff Babers asserts medical malpractice claims against BMC, arguing that the claims should relate back to the original complaint under Rule 15(c) and Louisiana's relation-back doctrine.[101]

The applicable prescriptive period for medical malpractice is governed by La. R.S. 9:5628(A), which provides:

> No action for damages for injury or death against any physician, chiropractor, nurse, licensed midwife practitioner, dentist, psychologist, optometrist, hospital, or nursing home duly licensed under the laws of this state, or community blood center or tissue bank as defined in R.S. 40:1231.1(A), whether based upon tort, breach of contract, or otherwise, arising out of patient care shall be brought unless filed within one year from the date of the alleged act, omission, or neglect, or within one year from the date of discovery of the alleged act, omission, or neglect;

---

[100] *Id.* at 584.
[101] R. Doc. 48 at 6.

however, even as to claims filed within one year from the date of such discovery, in all events such claims shall be filed at the latest within a period of three years from the date of the alleged act, omission, or neglect.

Under La. R.S. 9:5628(A), medical malpractice claims are subject to a strict one-year prescriptive period, which begins to run from the date of the alleged malpractice or from the date of discovery—whichever is later. In *Warren v. Louisiana Med. Mut. Ins. Co.*, the Louisiana Supreme Court held that amendments asserting medical malpractice claims cannot relate back.[102]

Here, Plaintiff Babers' medical malpractice claims are facially prescribed. The original complaint was filed on December 17, 2021, within one year of the alleged malpractice, but Ms. Babers' amended complaint was not filed until December 12, 2022—nearly two years after the alleged malpractice and well beyond the one-year prescriptive period. Plaintiff argues that the amended complaint should relate back to the original complaint under *Nobre* and the *Giroir* factors. However, the Louisiana Supreme Court's holding in *Warren* forecloses this argument. The Court in *Warren* made clear that relation back is not permitted for medical malpractice claims.

Therefore, even if the *Giroir* factors were satisfied, the legal bar imposed by La. R.S. 9:5628(A) and the Louisiana Supreme Court's binding interpretation in

---

[102] *Warren v. Louisiana Med. Mut. Ins. Co.*, 21 So. 3d 186, 207 (La. 2008) ("Because medical malpractice actions are governed by the specific provisions of [the Medical Malpractice Act (the "Act")] regarding prescription and suspension of prescription, under *Borel*, we find that any general codal article which conflicts with these provisions may not be applied to such actions in the absence of specific legislative authorization in the Act. The Act has no rules allowing relation back of pleadings for medical malpractice claims. The application of Article 1153 would permit the adding of an plaintiff subsequent to the expiration of the three-year period provided for in La. R.S. 9:5628, and would read out of the statute the prescription and suspension period provisions by La. R.S. 9:5628 and La. R.S. 40:1299.47; therefore, La. C.C.P. art. 1153 may not be applied to the medical malpractice action under the reasoning of *LeBreton* and *Borel*").

*Warren* prohibit the application of relation back to medical malpractice claims. Accordingly, Ms. Babers' medical malpractice claims are untimely and cannot be saved by relation back.

### ii. Absence of Physician-Patient Relationship

Even if Plaintiff Babers' medical malpractice claims were not prescribed, they would still fail because there was no physician-patient relationship between Mr. Brown and BMC's medical staff. A medical malpractice claim under Louisiana law requires the existence of a physician-patient relationship.[103] "A physician-patient relationship exists as the result of an express or implied contract and patients expressly or impliedly contract with health care providers for the rendering of health care or professional services, whereas non-patients do not."[104]

Here, the evidence reflects that Mr. Brown repeatedly informed the ED staff that he was not seeking medical treatment and was only at BMC to obtain the results of a prior COVID test. The ED staff asked Mr. Brown whether he needed to be seen for medical treatment, and he declined. The staff's inquiry and Mr. Brown's refusal to seek care do not give rise to a physician-patient relationship as BMC never rendered health care or professional services to Mr. Brown.

Therefore, even if the Court were to find that Plaintiff's medical malpractice claims were not prescribed—which they are—the claims would nonetheless fail due

---

[103] *Kelleher v. Univ. Med. Ctr. Mgmt. Corp.*, 332 So. 3d 654, 657 (La. 2021) ("[T]his Court has explained that a prerequisite of a medical malpractice case is the existence of a physician-patient relationship").
[104] *Id.* (internal quotations omitted).

to the absence of a physician-patient relationship necessary to sustain a medical malpractice claim under Louisiana law.

Accordingly, the Motion's request to dismiss these claims is **GRANTED** and they are dismissed with prejudice.

### IV.    CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that Defendant BMC's Motion for Summary Judgment (R. Doc. 80) is **GRANTED IN PART** and **DENIED IN PART** as follows:

1. Defendant's Motion is **DENIED** as to Plaintiff's claims under the Emergency Medical Treatment and Labor Act (EMTALA).

2. Defendant's Motion is **GRANTED** as to Plaintiff's state law claims under La. R.S. 40:2113.4 and Plaintiff's medical malpractice claims, which are hereby **DISMISSED WITH PREJUDICE**.

**THUS DONE AND SIGNED** this 19th day of March, 2025.

**JERRY EDWARDS, JR.**
**UNITED STATES DISTRICT JUDGE**